UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BROCK LESNAR, | : CIVIL ACTION NO.: |
| | : 3:05 CV 221 (CFD) |
| Plaintiff, | : |
| | : |
| V. | : |
| | : |
| WORLD WRESTLING ENTERTAINMENT, INC., | : |
| | : |
| Defendant. | : MAY 17, 2005 |

**PLAINTIFF'S LOCAL RULE 56(a)(1)**
**STATEMENT OF MATERIAL FACTS**

1.  WWE, formerly known and/or doing business as the World Wrestling Federation ("WWF") and World Wrestling Federation Entertainment, Inc. ("WWFE"), is a self-described integrated media and entertainment company principally engaged in the development, production and marketing of television programming and live events and the licensing and sale of branded consumer products. (See Exhibit D, ¶ 8, Exhibit E, ¶ 8).

2.  WWE's primary business includes the production and promotion of professional wrestling exhibitions and events for live audiences and for televised broadcast and/or cablecast, including pay-per-view cablecast events, and the licensing and sale of associated materials, goods and merchandise, including but not limited to T-shirts, posters, photos, video tapes, video cassettes, video disks, dolls, books, biographies, articles and stories. (Exhibit D, ¶ 9, Exhibit E, ¶ 9).

3. The individuals who appear as wrestlers in WWE events and exhibitions are performing artists who portray fictional characters, and who put on "demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public" within a scripted storyline. (Exhibit F, ¶ 5; Exhibit G; ¶ 2, Exhibit H under caption "Live and Televised Events"; Exhibit E, ¶ 10).

4. WWE's professional wrestling exhibitions and events constitute entertainment and are not competitive sports or contests, although WWE's professional wrestling performers generally do possess and exhibit tremendous athletic skill. (Exhibit F, ¶ 6; Exhibit G; ¶ 2, Exhibit H under caption "Live and Televised Events"; Exhibit E, ¶ 11).

5. WWE is currently the owner of the two dominant professional wrestling brands in the United States, WWE "Raw" and WWE "Smackdown." (Exhibit E, ¶ 12; Exhibit H under captions "Business Overview" and "Live and Televised Events").

6. Within the United States, there are no other professional wrestling promotions which provide any meaningful competition to WWE in the production and promotion of professional wrestling exhibitions and events. (Exhibit H, noting under captions "Business Overview" and "Branded Merchandise – Home Video" that WWE owns the acquired libraries of its former competitors, World Championship Wrestling ("WCW"), Extreme Championship Wrestling (ECW") and the American Wrestling Association ("AWA").

7. Lesnar began his career as an amateur wrestler at Bismarck State College, North Dakota, where he was a Junior College All-American in 1997 and 1998, and Junior College National Champion in 1998. (Exhibit F, ¶ 2).

8.  In 1999 Lesnar transferred to the University of Minnesota, where he was Big Ten Champion in 1999 and 2000, NCAA Division I All-American in 1999 and 2000, NCAA Division I National Runner-Up in 1999, and NCAA Division I National Wrestling Champion, Heavyweight Division, in 2000. (Exhibit F, ¶ 2).

9.  On or about June 9, 2000, WWE and Lesnar entered into a "World Wrestling Federation Entertainment, Inc. Booking Contract," pursuant to which Lesnar agreed to perform at, and WWE agreed to promote him in WWE's professional wrestling exhibitions and events. (Exhibit F, ¶ 4; Exhibits A and A-1; Exhibit E, ¶ 16).

10. Pursuant to Sections 7.1(a), 7.11 and 9.3, the Developmental Booking Contract contemplated that Lesnar would train to be a professional wrestling performer with WWFE's affiliate, Ohio Valley Wrestling, a regional wrestling promotion based in Louisville, Kentucky, where he would attend WWE's "training camp," then progress to WWFE nationally televised exhibitions. (Exhibit F, ¶¶ 7 & 9, Exhibit A).

11. Pursuant to Sections 6.1 and 6.3, the Developmental Booking Contract's term was ostensibly for a term of three years from its effective date of June 9, 2000. (Exhibit F, ¶ 8).

12. From June 2000 to March 2002, Lesnar appeared and performed in Ohio Valley Wrestling's professional wrestling exhibitions and events as required by the Developmental Booking Contract. (Exhibit F, ¶ 10; Exhibit E, ¶¶ 19-20).

13. The training Lesnar received was not unique and did not involve any trade secrets. Rather, a number of current and former professional wrestlers and promoters provide the same or similar training to anyone interested in a professional career at various "wrestling schools"

across the United States, where the would-be performers are taught how to execute various wrestling maneuvers, how to safely work with a wrestling partner to lessen the risk of injury and how to conduct television interviews which are the hallmark of the professional wrestling business. (Exhibit F, ¶ 11).

14.     In March 2002, Lesnar appeared and performed for the first time on a WWE nationally televised professional wrestling program, and thereafter regularly appeared and performed in WWE live, televised, cable cast, and pay-per-view professional wrestling exhibitions and events. (Exhibit F, ¶ 12; Exhibit E, ¶ 21).

15.     On August 25, 2002, WWE made Lesnar its World Heavyweight Champion in a pay-per-view cablecast event in which Lesnar's character defeated the character known as "The Rock." (Exhibit F, ¶ 13; Exhibit E, ¶ 22).

16.     On March 30, 2003, WWE made Lesnar its World Heavyweight Champion for a second time in a pay-per-view cablecast event in which Lesnar's character defeated the character known as "Kurt Angle." (Exhibit F, ¶ 14; Exhibit E, ¶ 23).

17.     Pursuant to Section 12.2 of the Developmental Booking Contract, and only in the event Lesnar breached the agreement, he was prohibited: (i) for a period of one year; (ii) from working or performing in any capacity for "World Championship Wrestling," or any affiliated or subsidiary company thereof; or (iii) any other wrestling organization and/or entity owned or controlled by Turner Broadcasting System, Inc., Time-Warner, Inc. or any affiliated or subsidiary company thereof, including without limitation appearances in or at live events, pay-per-view or other televised events. (Exhibit A, Section 12.2; Exhibit E, ¶ 25).

18.  WWE has since acquired World Championship Wrestling's business and all related trademarks and intellectual property, and no longer has any meaningful competitors in the business of professional wrestling in North America. (Exhibit G, ¶ 2; Exhibit H, under captions "Business Overview" and "Branded Merchandise"; Exhibit E, ¶ 26, wherein "WWE admits that it acquired certain intellectual property previously owned by World Championship Wrestling.").

19.  On or about July 1, 2003, WWE and Lesnar entered into a World Wrestling Entertainment, Inc. Booking Contract that superseded and replaced the Developmental Booking Contract, pursuant to which Lesnar agreed to perform at, and WWE agreed to promote him in WWE's professional wrestling exhibitions and events. (Exhibit F, ¶ 16; Exhibit B).

20.  From July 1, 2003, to and including March 14, 2004, Lesnar performed as agreed pursuant to the terms of the Booking Contract. (Exhibit F, ¶ 18; Exhibit E, ¶ 28, admitting dates of performance).

21.  On September 16, 2003, WWE made Lesnar its World Heavyweight Champion for the third and final time in a televised event in which Lesnar's character again defeated the character known as "Kurt Angle." (Exhibit F, ¶ 19; Exhibit E, ¶ 29, admitting Lesnar became WWE Champion on 9/8/03 edition of "Smackdown").

22.  On March 14, 2004, Lesnar made his last professional wrestling performance for WWE in a pay-per-view cablecast event in which Lesnar's character was defeated by the character known as "Goldberg." (Exhibit F, ¶ 20; Exhibit E, ¶ 30).

23.  At all times during his association with WWE, under the Developmental Booking Contract and Booking Contract, Lesnar was an artistic performer, and never agreed to appear or

participate in any form of true combat sport or true athletic contest for WWE, nor was Lesnar trained by WWE to participate in such activities. (Exhibit F, ¶ 21; Exhibit E, ¶ 31).

24.   Pursuant to Section 9.15 of the Booking Contract, Lesnar was prohibited "During the Term" only from working or performing in any capacity for any other "wrestling organization and/or entity not owned or controlled by [WWE]". (Exhibit B, Section 9.15).

25.   Pursuant to Section 12.2 of the Booking Contract, and only in the event Lesnar breached the agreement, he was prohibited from: (i) working or performing in any capacity; (ii) in the United States; (iii) for any other wrestling organization and/or entity not owned or controlled by [WWE] or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events; (iv) for one year from the date of termination of the agreement as a result of breach by Lesnar. (Exhibit B, Section 12.2).

26.   Pursuant to Sections 6.1 and 6.3, the Booking Contract's term was ostensibly for a period of seven years from its effective date of July 1, 2003, or until June 30, 2010. (Exhibit F, ¶ 17; Exhibit B, Sections 6.1 and 6.3).

27.   Pursuant to Section 11.1 of the Booking Contract, however, WWE could terminate the Booking Contract with or without cause upon six months advance notice to Lesnar. (Exhibit B, Section 11.1).

28.   The Booking Contract also contained a number of other provisions pursuant to which it could be terminated prior to the expiration of the ostensible seven-year term, to wit:

(a) Pursuant to Section 10.2(b) of the Booking Contract, in the event Lesnar is injured and unable to wrestle for six consecutive months, WWE could terminate the Booking Contract;

(b) Pursuant to Section 10.2(b) of the Booking Contract, in the event Lesnar is unable to wrestle for any reason other than injury, WWE could terminate the Booking Contract;

(c) Pursuant to Section 11.1 of the Booking Contract, WWE and Lesnar could agree to an early termination of the Booking Contract by "a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of the other;" and

(d) Pursuant to Section 12.1 of the Booking Contract, WWE had the right, in its sole discretion, to terminate the agreement if Lesnar is habitually late or absent for appearances, fails any physical examination, or if his performance is unsatisfactory in WWE's sole discretion; and

(e) Pursuant to Section 12.1 of the Booking Contract, WWE could terminate the Booking Contract in the event of Lesnar's Breach.

(Exhibit B, Sections 10.2(b), 11.1 and 12.1).

29. On or before March 15, 2004, Lesnar requested pursuant to Section 11.1(b) of the Booking Contract that WWE consent to an Early Termination for the stated reason that he desired to try out for a roster spot on a National Football League team. (Exhibit F, ¶ 23).

30.     At WWE's request and insistence, on or about April 2004, Lesnar and WWE entered into a Settlement Agreement and Release of All Claims pursuant to which an Early Termination of the Booking Contract was granted, effective March 15, 2004 (the "Settlement Agreement"). (Exhibit F, ¶ 24, Exhibit C).

31.     The Settlement Agreement was prepared by WWE and signed by Lesnar as written without negotiation or alteration. (Exhibit F, ¶ 25).

32.     Pursuant to Section 1 of the Settlement Agreement, the Booking Contract was terminated, except and other than the limited non-competition restrictions in Section 12.2 of the Booking Contract, which were expressly incorporated into the Settlement Agreement, and Section 7 of the Booking Contract, which requires WWE to continue paying Lesnar royalties for the exploitation of certain intellectual property. (Exhibit C, Section 1).

33.     Section 4(a) of the Settlement Agreement purports to substantially broaden the term, territory and scope of the limited non-competition restrictions in Section 12.2 of the Booking Contract, in that it provides in relevant part that Lesnar:

> ". . . shall not appear, participate and/or associate either directly or indirectly in any way throughout the world with any professional wrestling, ultimate fighting and/or sports entertainment companies, associations, joint ventures, sole proprietorships, and/or partnerships, other that the WWE, through the expiration date of the original Agreements of June 30, 2010."

(Exhibit C, Section 4(a)).

34. Subsequent to his release from the Booking Contract, Lesnar diligently pursued his desire to become a player in the National Football League, and obtained a tryout and attended training camp with the NFL's Minnesota Vikings. (Exhibit F, ¶ 26).

35. Despite Lesnar's diligent efforts, however, neither the Minnesota Vikings, nor any other NFL team, offered to sign him to a contract. (Exhibit F, ¶ 27).

36. When it became apparent to Lesnar in the fall of 2004 that he would not be signed to an NFL season contract, he inquired of WWE whether it would be possible to return to wrestling. (Exhibit F, ¶ 30).

37. From on or about October 2004 and thereafter, WWE has consistently advised Lesnar that it has no interest in retaining his services as a professional wrestler or otherwise. (Exhibit F, ¶ 31).

38. WWE would not even consider allowing Lesnar to return with a reduced travel and performance schedule, and in its Answer, WWE characterized Lesnar's request for a more reasonable schedule as an "unreasonable demand." (Exhibit F, ¶ 31; Exhibit E, ¶ 53).

39. WWE has not promoted Lesnar as a professional wrestling performer since March 15, 2004. (Exhibit F, ¶ 32; Exhibit E, ¶ 54).

40. Since March 15, 2004, Lesnar has not worked or performed as a professional wrestler for WWE or any other organization or entity, and WWE has not paid Lesnar any performance fees. (Exhibit F, ¶ 33; Exhibit E, ¶ 55).

THE PLAINTIFF,
BROCK LESNAR

By: */s/ Scott S. Centrella*

Scott S. Centrella / ct05809
Diserio Martin O'Connor & Castiglioni LLP
One Atlantic Street
Stamford, Connecticut 06901
Tel: 203-358-0800
E-mail: scentrella@dmoc.com

David Bradley Olsen / 197944
Henson & Efron, P.A.
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota 55402
Tel: 612-339-2500
E-mail: dolsen@hensonefron.com
*Attorneys for the Plaintiff, Brock Lesnar*

H:\LIT\JMS\23026.Statement of Material Facts.DOC

## **CERTIFICATION**

      This is to certify that a true copy of the foregoing has been mailed to all counsel and pro se parties of record:

      Daniel L. Schwartz, Esq.
      Day, Berry & Howard, LLP
      One Canterbury Green
      Stamford, CT 06901
      Phone: 203-977-7536
      Fax:    203-977-7301

      Jerry S. McDevitt, Esq.
      Mark D. Feczko, Esq.
      Christopher Michalski, Esq.
      Kirkpatrick & Lockhart Nicholson Graham LLP
      535 Smithfield Street
      Pittsburgh, PA 15222
      Phone: 412-355-6500
      Fax:    412-355-6501

Dated: May 17 2005
       Stamford, CT

                                                    _/s/ Scott S. Centrella_
                                                    Scott S. Centrella/ct05809

H:\J.TJMS\23026.Statement of Material Facts.DOC