**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BROCK LESNAR, | : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:05CV221 (CFD) |
| vs. | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : | |
| Defendant. | : | DECEMBER 6, 2005 |

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant World Wrestling Entertainment, Inc. ("WWE") respectfully submits this memorandum of law in support of its motion for temporary restraining order and preliminary injunction against Plaintiff Brock Lesnar ("Lesnar").

## I. INTRODUCTION

WWE is compelled to seek a temporary restraining order and preliminary injunction to preserve the status quo pending the Court's determination of the claims in this action. WWE recently learned that Lesnar has entered into a contract to perform for New Japan Pro Wrestling ("New Japan") on December 10 and 11, 2005 and January 4, 2006 in brazen disregard and violation of the Settlement Agreement and General Release of All Claims (the "Settlement Agreement") specifically at issue in this matter. This information was disclosed for the first time at the conclusion of Lesnar's deposition on November 21, 2005, after months of Lesnar concealing, and indeed affirmatively misrepresenting, Lesnar's dealings and arrangements with New Japan.

As the Court is aware, Lesnar filed this action seeking a declaration that the Settlement Agreement is unenforceable and, therefore, does not prohibit him from performing or appearing for other professional wrestling promotions. WWE has asserted counterclaims that Lesnar's prior dealings with New Japan—let alone his upcoming performances for New Japan of which WWE just learned and which are the subject of this motion—breach his contractual obligations to WWE under the Settlement Agreement.

Remarkably, Lesnar concedes that performing for New Japan is in violation of the Settlement Agreement, and indeed in violation of the specific provisions of the Settlement Agreement at issue in this litigation. Yet, as he testified in his deposition, he has unilaterally decided that he need not wait for the Court's ruling on his claims:

> **Q: And on its face do you understand [the Settlement Agreement] to prohibit you from appearing for New Japan if enforceable?**
>
> **A: Yeah, I guess so.**
>
> . . .
>
> **Q: And you made a decision not to wait for the Court's decision on your request?**
>
> **A: Exactly 100 percent right.**

Deposition of Brock Lesnar ("Lesnar Depo.") at 132:2-9, Ex. 1.[1] Lesnar's disrespect for the judicial process, which he invoked, mirrors his flippant attitude towards his contractual obligations. According to Lesnar's view of contracts, he believes he should not be bound by obligations he undertook in written contracts he signed if he chose to ignore reading them. Lesnar Depo. at 54:21-56:3, Ex. 1. Indeed, Lesnar concedes that he has not been "a man of his

---

[1] All references to Exhibits are to the exhibits contained in the Appendix (the "Appendix") in Support of WWE's Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction filed concurrently herewith.

word" in failing to comply with his obligations under the Settlement Agreement. Id. at 283:10-13, Ex. 1.

If Lesnar were permitted to perform for New Japan during the pendency of this lawsuit, he would as a practical matter usurp the Court's authority to resolve the core issue in dispute. WWE concomitantly would suffer, without any ruling on the merits by the Court, the irreparable harm that the Settlement Agreement was intended to prevent.  In essence, therefore, Lesnar has proclaimed himself judge and jury in this matter.  Such contemptuous conduct certainly should not be countenanced.  Accordingly, this Court should enter a temporary restraining order and a preliminary injunction enjoining Lesnar from: (1) performing or appearing in association with New Japan on December 10 and 11, 2005 and January 4, 2006; (2) otherwise performing or appearing in association with New Japan or any other person or entity involved in professional wrestling during the pendency of this litigation; (3) entering into any agreement to perform or appear in association with New Japan or any other person or entity involved in professional wrestling during the pendency of this litigation; and (4) otherwise breaching his obligations to WWE under the Settlement Agreement.

## II. BACKGROUND

### A.    WWE's Business Operations

WWE is an integrated media and entertainment company principally engaged in the development, promotion, and marketing of television programming, pay-per-view programming, and live arena events featuring its unique brand of professional wrestling, for which it coined the term "sports entertainment."  WWE's sports entertainment programming is perhaps best described as an action-packed, episodic drama that is akin to an ongoing, ever-developing soap opera.  Like any dramatic program, the success of WWE's sports entertainment programming is

dependent on the development of interesting and well-formed storylines. While wrestling matches often serve as the catalyst or focal point around which WWE storylines evolve, WWE strives to create unique and compelling characters which attract the interest, concern, and imagination of the consuming public. The development of the character-driven storylines attracts and maintains viewers' interest from week to week and program to program. Each character is distinctively delineated with a unique persona, history, relationships, music and visual appearance and behavior. WWE invests considerable resources in the training, development, and promotion of the talent who are portrayed as WWE characters.

WWE promotes hundreds of live events each year in arenas and stadiums in cities around the world, including, specifically, Japan. WWE also currently produces four nationally and internationally-distributed television programs each week on broadcast and cable television, and two weekly syndicated television programs. WWE produces monthly pay-per-view programs available through cable and satellite pay-per-view distributors around the world. In addition, WWE engages in an extensive licensing program pursuant to which WWE's copyrighted characters, trademarks, service marks and other intellectual property rights are depicted on myriad consumer products, including, among other things, home videos, video games, action figures and clothing.

Most pertinent here, WWE has significant penetration in the Japanese market. See Affidavit of Linda McMahon ("L. McMahon Aff.") at ¶ 4, Ex. 2. WWE television programming is aired in Japan five days each week, as well as certain repeat airings, on J SPORTS television networks and WWE pay-per-view programs are aired monthly on Sky PerfecTV. Id. at ¶ 5, Ex. 2. In addition, WWE regularly promotes live events in Japan. Id. at ¶ 6, Ex. 2. WWE promoted nine events in Japan in 2004 and 2005 alone, which were attended by over 106,000 fans, and

WWE events already are scheduled in Japan on February 4 and 5, 2006. Id. at ¶ 6, Ex. 2. WWE also distributes home videos and other branded consumer products in Japan pursuant to license agreements with Japanese companies. Id. at ¶ 6, Ex. 2. In general, professional wrestling is extremely popular in Japan and thus WWE views Japan as one of its principal international growth opportunities. Id. at ¶ 8, Ex. 2. In this regard, WWE directly competes with Japanese wrestling promotions, including, specifically, New Japan. Id. at ¶ 8, Ex. 2.

## B. Lesnar's Relationship With WWE

On the heels of winning the 2000 NCAA heavyweight amateur wrestling title, Lesnar entered into a lucrative contract with WWE on or about June 7, 2000. In the negotiations over that contract with Lesnar's lawyer/agent, David Olsen ("Olsen"), WWE largely accommodated Lesnar's requests, including, for example, (i) an initial term of three years; (ii) a signing bonus and annual minimum compensation escalating to $300,000 in year three; and (iii) certain modifications to WWE's standard provisions regarding the exclusivity of rights granted to WWE. See 2000 Loan Out Agreement and Booking Contract, Ex. 3. Over the next few years, WWE invested substantial amounts of time and money in Lesnar by training him and developing and promoting his name, and the persona and character he portrayed. See Affidavit of Vince McMahon ("V. McMahon Aff.") at ¶ 3, Ex. 4. To that end, WWE regularly promoted Lesnar in featured storylines and/or main events of WWE programming, including portraying Lesnar as the WWE Heavyweight Champion for extended periods in 2002, 2003 and 2004. Id. at ¶ 3, Ex. 4.

In June 2003, WWE entered into a new seven year contract with Lesnar pursuant to which he granted WWE certain exclusive, worldwide rights through June 2010. See 2003 Loan

Out Agreement and Booking Contract ("2003 Contract"), Ex. 5.  Such exclusive, worldwide

rights Lesnar granted to WWE include, among other things:

- To engage Lesnar's performance in wrestling matches at professional wrestling exhibitions, as well as any other appearances in which Lesnar performs services as a professional wrestler, whether before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise  (2003 Contract at ¶ 1.1(a), Ex. 5).

- To enter into agreements for the exploitation of Lesnar's intellectual property (including, but not limited to, Lesnar's name and likeness) for merchandising and endorsements (2003 Contract at ¶ 1.1(c), Ex. 5).

- To video tape, film, photograph, or otherwise record, Lesnar's appearance, performance, and any other work product for any wrestling event (2003 Contract at ¶ 2.1, Ex. 5).

- To use Lesnar's intellectual property (including, but not limited to, Lesnar's name and likeness) in connection with the manufacture, production, broadcast, distribution, sale, and other commercial exploitation in any manner of any and all materials, goods, merchandise and other items.  By way of example and not of limitation, such items include t-shirts, posters, photos, videotapes, dolls, books, articles, and any other materials, goods, merchandise or items relating to Lesnar (2003 Contract at ¶ 4.1, Ex. 5).

- Lesnar's acknowledgement and agreement that he shall not work or perform in any capacity for any other wrestling organization and/or any entity not owned or controlled by WWE, including, without limitation, appearances in live events, pay-per-view or other televised events (2003 Contract at ¶ 9.15, Ex. 5).

The exclusive, worldwide rights granted by Lesnar to WWE pursuant to the 2003 Contract,

including, but not limited to, those rights described above collectively are referred to as Lesnar's

"Exclusivity Obligations."  In consideration for Lesnar's Exclusivity Obligations to WWE, the

2003 Contract provided Lesnar with a guaranteed minimum compensation of $1 million for each

contract year, among the highest paying contracts WWE had with any of its talent.  2003

Contract at ¶ 7.1, Ex. 5.  With this investment in Lesnar and the understanding that WWE would

have until 2010 to realize a return on its investment, WWE intended to build Lesnar as the

centerpiece of its programming for the next decade.  V. McMahon Aff. at ¶ 4, Ex. 4.  Lesnar

admitted that he understood that he was binding himself to appear exclusively for WWE, and

could not perform for any other promotion—including, specifically, New Japan—during the term of the 2003 Contract. Lesnar Depo. at 61:11-14, Ex. 1. Lesnar further admitted that he understood he was exclusively licensing, among other things, his name and likeness to WWE during the term of the 2003 Contract. Id. at 63:22-64:8, Ex. 1.

Despite his success, however, Lesnar carped about his multi-million dollar contract and life as a WWE featured performer. As he well knew when he signed the 2003 Contract, WWE performers perform at various venues across the United States and around the world each and every week and, as a result, must travel. In a recent media article, Lesnar is quoted as describing his mindset at that time: "I wasn't ready to be traveling 300 days a year, I wasn't ready for the money, I wasn't ready for the responsibilities . . . . I wasn't ready for a lot of things. I had a lot of growing up to do. I was forced to grow up." See 6/24/05 *Bismarck Tribune* article, Ex. 6. In January 2004, Lesnar demanded that WWE pay him to buy a private plane to ease his travel to weekly WWE events. V. McMahon Aff. at ¶ 5, Ex. 4. Despite the unprecedented nature of his request, WWE agreed and on or around February 9, 2004, WWE amended Lesnar's 2003 Contract to reimburse him for some of his private plane expenses. See Amendment to 2003 Contract at ¶ 9.3, Ex. 7.

Just one month later, in March 2004, after WWE had accommodated all of his demands and he had been scheduled and advertised to be a key performer at WWE's signature event, WRESTLEMANIA, as well as in the storylines developing from WRESTLEMANIA over the ensuing months, Lesnar informed WWE Chairman Vince McMahon that he intended to "quit" after WRESTLEMANIA in breach of his 2003 Contract. V. McMahon Aff. at ¶ 6, Ex. 4. At the same time, Lesnar requested an early release from certain of his contractual obligations in order to pursue a career in professional football, even though he had not played football since high

school. Id. at ¶ 7, Ex. 4. In fact, Lesnar told Mr. McMahon that he would "commit suicide" if WWE declined to grant him a release. Id. at ¶ 7, Ex. 4. Lesnar specifically represented that his request for a release was not to pursue wrestling or other forms of sports entertainment opportunities in any form elsewhere, but instead solely to pursue a professional football career. Id. at ¶¶ 7-8, Ex. 4.

### C. Lesnar Agrees To Enter Into The Settlement Agreement

In specific reliance on these material representations, WWE agreed to Lesnar's request for a release pursuant to the terms of the Settlement Agreement. See Settlement Agreement and General Release of All Claims ("Settlement Agreement"), Ex. 8. Most pertinent here, the Settlement Agreement explicitly reinforced the Exclusivity Obligations of Lesnar's 2003 Contract by providing that he would not engage in professional wrestling, sports entertainment and/or ultimate fighting activities for the same period covered by the 2003 Contract. Specifically in this regard, the Settlement Agreement provides, *inter alia,* as follows:

> 3. **INTELLECTUAL PROPERTY**
>
> (b) Original Intellectual Property: **Lesnar acknowledges that WWE has exclusive licensing rights under the [2003 Contract] until June 30, 2010 and he has represented that he will not enter into any licensing agreements if WWE grants his early release**. Lesnar thereby agrees that, in further consideration for his early release from [the 2003 Contract] and for the payment to him of royalties as set forth in Section 1 of this [Settlement] Agreement, **he will not license or otherwise grant to any third party, other than the National Football League, the rights to exploit his name and likeness**. (emphasis added)
>
> 4. **AFFIRMATION OF EXISTING OBLIGATIONS BY LESNAR**
>
> (a) Obligation Not to Compete with WWE: **Lesnar acknowledges that WWE's consent to an early release from his obligation under the [2003 Contract] was induced by his**

> **material representation that he has no intention of exploiting such early release in order to compete with WWE in the area of professional wrestling or sports entertainment events. Accordingly, Lesnar hereby covenants and agrees that he shall not appear, participate and/or associate either directly or indirectly in any way throughout the world with any professional wrestling, ultimate fighting and/or sports entertainment companies, associations, joint ventures, sole proprietorships, and/or partnerships, other than the WWE, through the expiration date of the original agreement of June 30, 2010.** Lesnar further agrees that WWE will suffer irreparable harm if he violates the aforementioned covenant, and that WWE shall be entitled to injunctive relief and other equitable relief to enforce the covenant. (emphasis added)

By his own admission, Lesnar understood that under the Settlement Agreement he "was released to play football and football only." Lesnar Depo. at 110:14-15, Ex. 1. He further understood that he was precluded under the Settlement Agreement from appearing or performing for any other professional wrestling, sports entertainment and/or ultimate fighting promotion. Id. at 144:11-16, Ex. 1. At the same time, the Settlement Agreement provided that Lesnar would continue to be paid royalties on sales of WWE-branded merchandise depicting his name and likeness (which to date have totaled over $125,000)—royalties to which Lesnar was not otherwise entitled due to his breach of his 2003 Contract. The Settlement Agreement also released Lesnar from potential claims arising from his breach of his 2003 Contract. V. McMahon Aff. at ¶ 8, Ex. 4. While Lesnar admittedly got what he wanted out of the Settlement Agreement, he now admits that he did not care about what promises he was making back to WWE in return, a fact amply demonstrated by his subsequent conduct. Lesnar Depo. at 110:17-111:10, Ex. 1.

Lesnar has admitted that he consulted with and was advised by his lawyer/agent, Olsen, in the negotiations over the terms of the Settlement Agreement. Id. at 25:23-26:21, Ex. 1. In fact, Lesnar conceded that Olsen advised him that he did not think the Settlement Agreement

looked good from Lesnar's perspective. Id. at 27:14-16, Ex. 1. Despite such advice and the opportunity to further consult with Olsen and negotiate the contractual terms, Lesnar executed the Settlement Agreement in or around May 2004. Id. at 103:21-105:24, Ex. 1. Significantly, neither Lesnar nor Olsen expressed to WWE prior to execution any issue with the terms of the Settlement Agreement, including those claims asserted in this litigation.

## D. Lesnar's Dealings With New Japan In Violation Of The Settlement Agreement[2]

After Lesnar's attempts to try out for the NFL proved unsuccessful, Olsen contacted WWE in September 2004 regarding the possibility of Lesnar returning to WWE. See September 30, 2004 Letter from David Olsen to Ed Kaufman, Ex. 9. Indeed, Lesnar testified in his deposition that he was advised by counsel that, under the Settlement Agreement, performing for WWE was his only option besides the NFL. Lesnar Depo. at 128:18-129:3, Ex. 1. Over the next several months, Lesnar and Olsen engaged in a series of discussions with WWE.

In the midst of those discussions, in December 2004, WWE advised Olsen that Lesnar was advertised to appear for a Japanese promotion (now known to have been New Japan) on January 4, 2005 and inquired whether that was true. See December 28, 2004 Email from Ed Kaufman to David Olsen, Ex. 10. Olsen responded by obfuscating and, in some instances, simply misrepresenting Lesnar's dealings with New Japan. In an email dated December 28, 2004, Olsen stated that Lesnar "is planning a trip to Japan to explore what options he may have . . . and there was a request that he come watch an event and be introduced to the crowd. . . . [but] Mr. Lesnar has declined the request to be introduced and is not planning any appearances." See

---

2 Notably, New Japan is anything but an innocent party in these circumstances. It is undisputed that New Japan was advised both by WWE and Lesnar of the existence and terms of the Settlement Agreement, as well as the pendency of this lawsuit. Lesnar Depo. at 239:25-240:21, Ex. 1. Nevertheless, New Japan decided to proceed to enter into a series of contracts with Lesnar. WWE reserves all rights and remedies against New Japan in this regard.

December 28, 2004 Email from David Olsen to Ed Kaufman, Ex. 11. In a subsequent email dated January 3, 2005, Olsen stated, "Mr. Lesnar reconfirmed this morning that he will not be making any appearances on behalf of, or giving any interviews for any Japanese promoters. If anything, he may watch a show from the audience . . . but will in no way participate. When I spoke to Mr. Lesnar this morning, however, he was even leaning toward not attending any shows at all." See January 3, 2005 Email from David Olsen to Ed Kaufman, Ex. 12. In an email dated January 5, 2005, the day after Lesnar actually did appear at the New Japan event, Olsen falsely stated, "In response to questions about the concerns that you have expressed, Mr. Lesnar confirmed that he **paid for his own trip**, ..." See January 5, 2005 Email from David Olsen to Ed Kaufman, Ex. 13 (emphasis added).

WWE only later learned the true extent of Lesnar's dealings with New Japan and the extent of his lawyer/agent's deception. Contrary to what WWE was told at the time, Lesnar admitted in his recent deposition that New Japan paid for his and his fiancée's (also a former-WWE talent) travel expenses, including, but not limited to, airfare, hotel, and transportation, in connection with his appearance at the January 4, 2005 event. Lesnar Depo. at 168:19-169:9; 171:2-11, Ex. 1. Moreover, WWE later learned that Lesnar did not simply attend the January 4, 2005 New Japan event as a spectator in the audience, but in reality: (i) he had dinner with New Japan's former-owner and biggest star, Antonio Inoki, the night before the show, Id. at 173:21-25, Ex. 1; (ii) he met with New Japan representatives to discuss his interest in performing for New Japan, Id. at 218:11-219:7, Ex. 1; (iii) he was sequestered in Inoki's office backstage until he was scheduled to appear, Id. at 174:22-175:3; 176:7-15, Ex. 1; (iv) on cue he entered the arena upon being introduced by Inoki to the crowd by walking down the same entry ramp from backstage to the ring used by all talent appearing in the show, Id. at 194:7-195:4, Ex. 1; (v) he

was introduced by Inoki as former "WWE champion," and featured on television and on the video screen at the arena, Id. at 181:3-6, Ex. 1; and (vi) his entrance and introduction were coordinated to facilitate photographers taking pictures of Lesnar in association with the New Japan event. Id. at 197:9-25, Ex. 1; see January 4, 2005 New Japan appearance videotape, Ex. 14. New Japan's identification of Lesnar in his introduction in association with WWE was without WWE's authorization or consent.

Lesnar not only misled WWE regarding the circumstances of his January 4, 2005 New Japan appearance, but he also misled this Court. Specifically, in his memorandum of law in support of Plaintiff's motion for summary judgment, Lesnar claimed in relation to the January 4, 2005 appearance for New Japan: "*he cannot even be seen in the audience* of a competitor's event regardless of whether he is paid to be there (Lesnar was not compensated) or whether he has consented to the use of his name and likeness on camera or otherwise (Lesnar did not consent to such use)." See Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 27, Ex. 15. Lesnar's representations to this Court that he was not compensated by New Japan for his appearance at the January 4, 2005 event and that he did not consent to New Japan's use of his name and likeness on camera during that event are inaccurate and duplicitous.

Lesnar's willful disregard for his contractual obligations continued after the filing of this action in February 2005. Despite conceding that the Settlement Agreement on its face prohibits him from appearing for New Japan and that he advised New Japan that he was "tied up until 2010," Lesnar Depo. at 220:9-10, Ex. 1, in April and May 2005, Lesnar's counsel sent proposals to New Japan regarding terms of a potential contract without WWE's knowledge or consent. See April 26, 2005 letter from David Olsen to Toru Nakahara, Ex. 16; May 17, 2005 letter from David Olsen to Simon Inoki, Ex. 17. In these proposals, Lesnar offered his wrestling services to

New Japan—in violation of his Exclusivity Obligations to WWE—despite concurrently filing this lawsuit challenging the enforceability of those very obligations. New Japan, however, did not respond at that time.

Having failed to entice New Japan with his proposal, Lesnar initiated highly-publicized overtures to WWE through the media in a purported attempt to return to WWE. See 6/24/05 *Bismarck Tribune* article, Ex. 6. In response to his request, WWE met with Lesnar on July 7, at which meeting WWE understood that an oral agreement was reached. In reality, however, Lesnar simply used WWE as a "stalking horse" in negotiations with New Japan. Immediately after his meeting with WWE, Lesnar contacted Bradley B. Rheingans, an agent for New Japan and a friend of Lesnar's, who advised New Japan that Lesnar was going to work for WWE. Lesnar Depo. at 235:13-236:16, Ex. 1. Within days, Simon Inoki contacted Lesnar directly and asked if New Japan representatives could visit Lesnar at his home in Minnesota. That meeting took place at the end of July or in early August 2005, at which time Lesnar and New Japan negotiated the terms of a contract. Id. at 238:25-239:7, Ex. 1. Lesnar testified that at an impasse in the negotiations, he advised the New Japan representatives that if they did not meet his demands he was "going to work for Vince [McMahon, the Chairman of WWE]." Id. at 239:14-16, Ex. 1.

On August 1, 2005, Lesnar signed a multi-year contract with New Japan,[3] which directly conflicts with and violates his Exclusivity Obligations to WWE pursuant to the Settlement Agreement. See August 1, 2005 Contract between Inoki Int'l Inc. and Brock Lesnar, Ex. 18. Indeed, Lesnar has conceded that he understood at the time of execution that his contract with

[3] Although the party to the contract is identified as Inoki Int'l Inc., Lesnar testified that he understood his deal to be with New Japan and that this contract memorialized the deal points of his negotiations with New Japan. Lesnar Depo. at 241:3-23, Ex. 1.

New Japan violated the terms of the Settlement Agreement.  Lesnar Depo. at 244:4-10, Ex. 1.

Throughout this period, Lesnar never told WWE that he was negotiating with New Japan or that

he intended to renege on the agreement he made with Vince McMahon at the July 7 meeting.

The very next day after he signed with New Japan, on August 2, 2005, Lesnar informed John

Laurinaitis, Vice President of Talent Relations for WWE, that he did not want to return to work

at WWE.  However, Lesnar intentionally omitted any mention of his agreement with New Japan.

Id. at 255:17-18; 256:22-24, Ex. 1.  In fact, Lesnar has admitted that he was specifically advised

by Olsen not to mention his discussions or agreement with New Japan to WWE.  Id. at 257:6-17,

Ex. 1.  WWE did not learn of Lesnar's "backdoor" negotiations with New Japan until Lesnar's

deposition in this action on November 21, 2005.

On August 16, 2005, in conjunction with his New Japan deal, Lesnar—unbeknownst to

WWE—signed a one show contract with New Japan to perform at its October 8, 2005 show at

the Tokyo Dome.  See August 16, 2005 Contract between New Japan and Lesnar, Ex. 19.

Despite his Exclusivity Obligations to WWE, Lesnar appeared and performed for New Japan at

its October 8, 2005 event at the Tokyo Dome, which Lesnar concedes was an appearance within

the meaning of the Settlement Agreement.  See October 8, 2005 New Japan Event DVD, Ex. 20;

Lesnar Depo. at 254:9-13, Ex. 1.  Both before and after the October 8 event, New Japan actively

promoted Lesnar's appearance on its website and through the Japanese wrestling media.  See

Promotional Materials, Ex. 21.  New Japan also exploited Lesnar's appearance by selling a DVD

of the October 8 event.  See Ex. 21.

At the conclusion of Lesnar's recent deposition, WWE learned that he entered into

additional contracts with New Japan on or around November 15, 2005 to appear and perform at

New Japan events scheduled for December 10, 2005, December 11, 2005, and January 4, 2006.

Such performances would constitute additional breaches of his Exclusivity Obligations to WWE. See November 15, 2005 Contracts between Lesnar and New Japan, Exs. 22 & 23. New Japan has actively advertised and promoted Lesnar's appearance at those events in further violation of Lesnar's Exclusivity Obligations. See Promotional Materials, Ex. 24.

Lesnar initially attempted to continue to conceal his dealing with New Japan in discovery in this litigation. Specifically, Lesnar refused to produce such documents in response to WWE's First Request for Production of Documents (see Lesnar's Response to WWE's First Request for Production of Documents to Plaintiff, Ex. 25), which necessitated WWE filing a motion to compel that was granted in part by the Court at the September 15, 2005 discovery hearing. Although subject to this Court's compulsion order, Lesnar did not produce documents relating to his agreement to perform for New Japan on October 8, 2005 until after he had already completed that performance. Similarly, Lesnar failed to produce documents concerning the contracts he signed with New Japan regarding his upcoming appearances on December 10, December 11, and January 4 until WWE's counsel specifically inquired at the end of Lesnar's deposition whether Lesnar had any other contracts with New Japan. Lesnar Depo. at 260:22-261:20, Ex. 1. Even now, Lesnar has continued to refuse to produce documents concerning his January 4, 2005 appearance described above. In short, Lesnar purposefully has delayed producing relevant documents and has deceived WWE and this Court in an ongoing effort to avoid his contractual obligations and to violate the Settlement Agreement.

## III. ARGUMENT

"The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the merits by preventing irreparable harm in the interim." H & R Block Eastern Tax Services, Inc. v. Brooks, No. 3:00-

CV-1332JCH, 2000 WL 33124809, at *2 (D. Conn. Oct. 12, 2000).[4] To that end, it is well settled that "[t]he purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute." Arthur Guinness & Sons, PLC v. Sterling Publishing Co., 732 F.2d 1095, 1099 (2d Cir. 1984); see also Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). The issuance of emergency injunctive relief here, therefore, is particularly warranted to prevent Lesnar from usurping the Court's authority to decide the core issues in this case.

Under the familiar standard for injunctive relief, a temporary restraining order should be granted whenever the movant can demonstrate that "it is likely to suffer possible irreparable injury if the injunction is not granted and 'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" Reuters Limited v. United Press International, Inc., 903 F.2d 904, 907 (2d Cir. 1990).[5] Irreparable harm must be shown by the movant "to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." Reuters Limited, 903 F.2d at 907 (internal citations omitted). To satisfy the standard for likelihood of success on the merits, "the movant 'need not show that success is an absolute certainty. . . . There may remain considerable room for doubt.'" H & R Block Eastern Tax Services, Inc., 2000 WL 33124809, at *2.

---

4 Copies of unreported cases cited herein are attached as Exhibit 26 in the Appendix.

5 The "standards which govern consideration of an application for a temporary restraining order. . . are the same standards as those which govern a preliminary injunction." Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc., 965 F.2d 1224, 1228 (2d Cir. 1992).

## A. WWE Will Suffer Irreparable Harm Absent Injunctive Relief

As a matter of fact and law, WWE will suffer imminent and irreparable harm if Lesnar is permitted to perform for New Japan on December 10 and 11, 2005, and January 4, 2006. That WWE will suffer irreparable harm, in fact, is undisputed. Lesnar specifically agreed in the Settlement Agreement that a breach of its provisions will cause WWE irreparable injury entitling WWE to injunctive relief:

> The Parties further agree that because of the special and unique obligations of Lesnar under this [Settlement Agreement], **a breach by Lesnar of the provisions in this [Settlement Agreement] shall cause WWE irreparable injury which cannot be adequately measured by monetary relief**. Consequently, without prejudice to or limitation of any other rights, remedies or damages which WWE is legally entitled to obtain, **WWE shall be entitled to injunctive and other equitable relief against Lesnar** to enforce the provisions of this [Settlement Agreement].

Settlement Agreement at ¶ 15, Ex. 8 (emphasis added). Similarly, in Section 4(a) of the Settlement Agreement concerning Lesnar's obligation not to perform for any other professional wrestling, sports entertainment and/or ultimate fighting promotions, Lesnar agreed "that WWE will suffer **irreparable harm** if he violates the aforementioned covenant, and that WWE **shall be entitled to injunctive relief** and other equitable relief to enforce the covenant." Settlement Agreement at ¶ 4(a), Ex. 8 (emphasis added). Accordingly, irreparable harm in these circumstances is admitted and thus is not in dispute. See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (holding that irreparable injury is established in part because of a contractual stipulation that concedes that a breach of the agreement will cause irreparable injury).

In addition, irreparable harm is established as a matter of law based on Lesnar's admission in his 2003 Contract of the "special, unique, and extraordinary nature" of his obligations to WWE. 2003 Contract at ¶ 12.3, Ex. 5. The seminal case of Philadelphia Ball

Club v. Lajoie, 51 A. 973 (Pa. 1902), held that where an athlete's services "are of such a unique character, and display such a special knowledge, skill, and ability, as renders them of particular value to the plaintiff, and so difficult of substitution"—as Lesnar acknowledged his services to be under the 2003 Contract and the Settlement Agreement—"**their loss will produce irreparable harm, in the legal significance of that term.**" Lajoie, 51 A. at 974 (emphasis added).

Relying on that authority, the Second Circuit has stated that "[i]t is a settled rule of law that where a person agrees to render services that are unique and extraordinary, and which may not be rendered by another, and has made a negative covenant in his agreement whereby he promises not to render such service to others, the court may issue an injunction to prevent him from violating the negative covenant in order to induce him to perform his contract." Shubert Theatrical Co. v. Rath, 271 F. 827, 831 (2d Cir. 1921) (citations omitted); Nassau Sports v. Peters, 352 F. Supp. 870, 875 (E.D.N.Y. 1972) ("it has long been settled that injunctive relief may be granted to restrain an employee's violation of negative covenants in a personal services contract and such enforcement has in fact been granted in numerous cases involving professional athletes."). Second Circuit law further holds that performers' and athletes' services are *prima facie* considered to be "unique and extraordinary" under this standard. Shubert, 271 F. at 831; Nassau Sports, 352 F. Supp. at 876. Lesnar's breach of his "special, unique, and extraordinary" obligations to WWE, therefore, has caused and continues to cause WWE irreparable harm.

Irreparable harm to WWE is also established because irreparable injury is presumed from its threatened loss of control over its exclusive rights to exploit Lesnar's unique name and likeness. See Ryan v. Volpone Stamp Co., Inc., 107 F. Supp. 2d 369, 403 (S.D.N.Y. 2000) (finding irreparable harm to support entry of preliminary injunction based on threat of loss of

control over licensing of plaintiff's name and likeness); see also Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982) (holding that loss of control over reputation and goodwill is by nature irreparable and cannot be adequately measured by monetary damages); 5 J. Thomas McCarthy, *McCarthy's on Trademarks and Unfair Competition* § 30.47 (4th ed. 2005).

Here, Lesnar has purported to grant New Japan exclusive rights to his wrestling services and to televise wrestling matches in which he performs (and to reproduce them in videotapes or disks) for the upcoming December 10, 2005, December 11, 2005 and January 4, 2006 New Japan events in violation of WWE's exclusive, worldwide licensing rights to Lesnar's name and likeness pursuant to Paragraph 3(b) of the Settlement Agreement.  As described in detail above, WWE invested significant resources to develop and promote Lesnar, thereby causing his name, likeness and wrestling persona to have unique value in the professional wrestling industry associated with and to WWE.  Among other things, WWE invested millions of dollars creating storylines and themes for Lesnar, and in promoting him through television, pay-per-view events, magazines, the Internet and other means.  Further, Lesnar's Exclusivity Obligations under the Settlement Agreement constitute valuable consideration underlying that contract.  Particularly given WWE's direct competition with New Japan in the Japanese market, WWE will suffer irreparable harm if it is deprived of the benefit of its bargain in entering into the Settlement Agreement and New Japan is permitted to exploit Lesnar's unique name and likeness in violation of Lesnar's Exclusivity Obligations to WWE.

**B.      WWE Will Likely Succeed On The Merits Of Its Claims**

Lesnar has squarely admitted that performing for New Japan on December 10 and 11, 2005 and January 4, 2006, is in violation and breach of the Settlement Agreement.  Because the

Settlement Agreement is enforceable and Lesnar's breach thereof is uncontested, WWE is likely to succeed on the merits. At a minimum, the enforceability of the Settlement Agreement remains pending before this Court and Lesnar should not be permitted to enter into an agreement with, and perform for, New Japan in admitted violation of the Settlement Agreement prior to the Court's determination on the merits of this action.

1. **The Settlement Agreement Is Valid And Enforceable**

It is undisputed that if the Settlement Agreement is valid and enforceable, then Lesnar's contracts with and performances for New Japan would be in breach of his obligations to WWE. Lesnar attempts to distort the Court's analysis on that core issue by mischaracterizing this lawsuit as a garden-variety non-compete dispute. Simply put, however, that is not this case. The agreement that Lesnar is attempting to invalidate is not an employment agreement with post-employment restrictions, but rather a settlement agreement arising as a result of Lesnar's breach of his 2003 Contract. As such, Lesnar's reliance on law applicable to non-compete agreements ancillary to employment is misplaced.

Lesnar ignores the applicable law governing settlement agreements, which provides that settlement agreements are contracts that are "encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the courts. Mr. J. v. Board of Educ., 98 F. Supp. 2d 226, 238 (D. Conn. 2000); see also Anita Foundations, Inc. v. ILGWU National Retirement Fund, 902 F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence."). "It is well recognized that an agreement to settle a lawsuit, voluntarily entered into, is binding on

the parties." Lorraine Brown and Virginia Otis v. Nationscredit Commercial, No. 3:99-CV-592 (EBB), 2000 WL 888507, at *2 (D. Conn. June 23, 2000).

Moreover, controlling law mandates that courts uphold and enforce settlement agreements even in the face of improvident bargains and unpalatable results:

> Courts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law ... Even if the result of the fair and logical enforcement of those unambiguous agreements seems unduly to burden one of the parties, we decline to embark [on] a voyage into uncharted waters in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably can be assumed to have relied for many years.

Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, L.P., 746 A.2d 1277, 1292 (Conn. 2000); see also Mr. J., 98 F. Supp. 2d at 238 (enforcing a settlement agreement to avoid allowing a party "to void a settlement agreement when [it] become[s] unpalatable ..."); Sartor v. Town of Manchester, 312 F. Supp. 2d 238, 244 (D. Conn. 2004) (Droney, J.) (enforcing terms of severance agreement because "[t]o allow subsequent events, such as the Board's change of heart, to upset the Agreement is inconsistent with basic contract law."). Accordingly, the Settlement Agreement is valid and enforceable pursuant to its terms, and should be enforced to prevent Lesnar from breaching it.

### 2. Lesnar Is In Breach Of His Exclusivity Obligations To WWE Under The Settlement Agreement

Lesnar's misconstruction of this case as a simple non-compete dispute is belied by the dispositive provisions of the Settlement Agreement that Lesnar has chosen to ignore. There is no dispute that Lesnar's contracts with and performances for New Japan plainly are in violation of Section 4(a) of the Settlement Agreement, which precludes Lesnar from "appear[ing],

participat[ing], and/or associate[ing] either directly or indirectly in any way throughout the world with any professional wrestling, ultimate fighting and/or sports entertainment companies . . . ." Settlement Agreement at ¶ 4(a), Ex. 8.  Indeed, although Lesnar has challenged the enforceability of Section 4(a) under inapposite non-compete principles, he concedes that his performances for New Japan are in violation of the terms of the Settlement Agreement.

In addition, Lesnar's conduct also violates his Exclusivity Obligations to WWE reaffirmed in the Settlement Agreement, including Section 3(b) of the Settlement Agreement, which grants to WWE "exclusive licensing rights under the Agreement until June 30, 2010" and precludes Lesnar from "licens[ing] or otherwise grant[ing] to any third party, other than the National Football League, the rights to exploit his name and likeness."  Settlement Agreement at ¶ 3(b), Ex. 8.  Lesnar has not challenged the enforceability of Section 3(b) in this action. Nevertheless, Lesnar has purported to grant New Japan exclusive rights to his wrestling services and to televise wrestling matches in which he performs (and to reproduce them in videotapes or disks) for the upcoming December 10, 2005, December 11, 2005 and January 4, 2006 New Japan events in violation of WWE's exclusive, worldwide licensing rights to Lesnar's name and likeness.  Lesnar has further admitted that he licensed and/or granted to New Japan the right to exploit his name and likeness for merchandise.  Lesnar Depo. at 117:22-118:11, Ex. 1.  It is undisputed, therefore, that Lesnar's contracts with New Japan are in violation of his Exclusivity Obligations to WWE under the Settlement Agreement, the enforceability of which are uncontested in this action.

Furthermore, Lesnar's Exclusivity Obligations were the principal consideration underlying WWE's agreement to grant Lesnar:  (i) a release to try out for the NFL; (ii) a release of potential claims WWE could assert for Lesnar's breach of his 2003 Contract; and (iii)

payment of royalties to which he otherwise would not have been entitled due to his breach, which to date total in excess of $125,000. Lesnar has willingly accepted the benefits he received under the Settlement Agreement, including the receipt of over $125,000 in licensing revenues. As a matter of law and equity, Lesnar should not be permitted to accept the benefits of the Settlement Agreement while depriving WWE of his Exclusivity Obligations—the only consideration WWE received under the Settlement Agreement.

## IV. CONCLUSION

For all the foregoing reasons, WWE has established that this Court should enter a temporary restraining order and preliminary injunction to prevent Lesnar from violating the Settlement Agreement, irreparably harming WWE, and depriving this Court of meaningful decision-making authority in this matter. Accordingly, this Court should enter a temporary restraining order and a preliminary injunction enjoining Lesnar from: (1) performing or appearing in association with New Japan on December 10 and 11, 2005 and January 4, 2006; (2) otherwise performing or appearing in association with New Japan or any other person or entity involved in professional wrestling during the pendency of this litigation; (3) entering into any agreement to perform or appear in association with New Japan or any other person or entity involved in professional wrestling during the pendency of this litigation; and (4) otherwise breaching his obligations to WWE under the Settlement Agreement.

Respectfully submitted,

By: ______________________________

Jerry S. McDevitt (*pro hac vice*, ct11783)
Mark D. Feczko (*pro hac vice*, ct20426)
Christopher Michalski (*pro hac vice*, phv0290)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500

Daniel L. Schwartz, Esq. (ct09862)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 977-7300

Attorneys for Defendant,
World Wrestling Entertainment, Inc.

**CERTIFICATION OF SERVICE**

This is to certify that a copy of the foregoing was sent by hand delivery ~~and/or first class mail, postage prepaid,~~ on the date hereof to the following counsel of record:

Scott S. Centrella, Esq.
Diserio Martin O'Connor & Castiglioni LLP
One Atlantic Street
Stamford, CT 06901

Daniel L. Schwartz

DECEMBER 6, 2005