120.    Lesnar initially attempted to continue to conceal his dealings with New Japan in discovery in this litigation.   Specifically, Lesnar refused to produce documents relating in any way to New Japan in response to WWE's First Request for Production of Documents (see Lesnar's Response to WWE's First Request for Production of Documents to Plaintiff), which necessitated WWE filing a motion to compel that was granted in part by the Court at the September 15, 2005 discovery hearing.

121.    Although subject to this Court's September 15 Order to produce documents concerning his dealings with New Japan, Lesnar did not produce documents relating to his agreement to perform for New Japan on October 8, 2005 until after he had already completed that performance.

122.    Similarly, Lesnar failed to produce documents concerning the contracts he signed with New Japan regarding his appearances on December 10, December 11, and January 4 until WWE's counsel specifically inquired at the end of Lesnar's deposition whether Lesnar had any other contracts with New Japan.  Lesnar Depo. at 260:22-261:20, Ex. 1.  Even now, Lesnar has continued to refuse to produce documents concerning his January 4, 2005 appearance and his February 19, 2006 appearance described above.

123.    To further avoid discovery on Lesnar's dealings with New Japan, Lesnar's lawyer/agent Olsen filed a motion to quash the subpoena for his deposition that had been scheduled for weeks (at a time mutually agreeable for the witness and all counsel) and to which no prior objection had been made until the business day before counsel were due to travel to Minnesota for the deposition.  On February 8, 2006, this Court denied the motion to quash.

124.    Lesnar admits that his contracts with and performances for New Japan violate the Settlement Agreement.  Id. at 132:2-9, Ex. 1.

21

125.    Lesnar has admitted that in violation of Section 3(b) of the Settlement Agreement, he granted New Japan exclusive rights to his wrestling services and to televise wrestling matches in which he performs (and to reproduce them in videotapes or disks) for the New Japan events that occurred on October 8, 2005, December 10, 2005, December 11, 2005 and January 4, 2006, as well as future New Japan events. Id. at 117:22-118:16, Ex. 1.

126.    Lesnar admits that he has not been "a man of his word" in failing to comply with his obligations under the Settlement Agreement. Id. at 283:10-13, Ex. 1.

127.    In entering into contracts with, and performing for, New Japan during the pendency of this action, Lesnar admits that he unilaterally decided that he need not wait for the Court's ruling on his claims. Id. at 132:2-9, Ex. 1.

## II.    CONCLUSIONS OF LAW

### A.    Standards For Issuing Preliminary Injunctive Relief

1.    "The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the merits by preventing irreparable harm in the interim." H & R Block Eastern Tax Services, Inc. v. Brooks, No. 3:00-CV-1332JCH, 2000 WL 33124809, at *2 (D. Conn. Oct. 12, 2000).[3]

2.    It is well settled that "[t]he purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute." Arthur Guinness & Sons, PLC v. Sterling Publishing Co., 732 F.2d 1095, 1099 (2d Cir. 1984); see also Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

---

[3]      Copies of unreported cases cited herein are attached as Exhibit J in the Supplemental Appendix.

3.      A preliminary injunction should be granted whenever the movant can demonstrate that "it is likely to suffer possible irreparable injury if the injunction is not granted and 'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" Reuters Limited v. United Press International, Inc., 903 F.2d 904, 907 (2d Cir. 1990).

4.      Irreparable harm must be shown by the movant "to be imminent, not remote or speculative, and [the] alleged injury must be one incapable of being fully remedied by monetary damages." Reuters Limited, 903 F.2d at 907 (internal citations omitted).

5.      To satisfy the standard for likelihood of success on the merits, "the movant 'need not show that success is an absolute certainty. . . . There may remain considerable room for doubt.'" H & R Block Eastern Tax Services, Inc., 2000 WL 33124809, at *2.

**B.      WWE Has Established Irreparable Harm**

6.      Lesnar specifically agreed in the Settlement Agreement that a breach of its provisions will cause WWE irreparable injury entitling WWE to injunctive relief:

> The Parties further agree that because of the special and unique obligations of Lesnar under this [Settlement Agreement], **a breach by Lesnar of the provisions in this [Settlement Agreement] shall cause WWE irreparable injury which cannot be adequately measured by monetary relief**. Consequently, without prejudice to or limitation of any other rights, remedies or damages which WWE is legally entitled to obtain, **WWE shall be entitled to injunctive and other equitable relief against Lesnar** to enforce the provisions of this [Settlement Agreement].

Settlement Agreement at ¶ 15 (emphasis added).

7.      Similarly, in Section 4(a) of the Settlement Agreement concerning Lesnar's obligation not to perform for any other professional wrestling, sports entertainment and/or

ultimate fighting promotions, Lesnar agreed "that WWE will suffer **irreparable harm** if he violates the aforementioned covenant, and that WWE **shall be entitled to injunctive relief** and other equitable relief to enforce the covenant." Settlement Agreement at ¶ 4(a) (emphasis added).

8.      Accordingly, irreparable harm in these circumstances is admitted and thus is not in dispute. See Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir. 1999) (holding that irreparable injury is established in part because of a contractual stipulation that concedes that a breach of the agreement will cause irreparable injury).

9.      Under Connecticut law, "[i]rreparable damage would inevitably result from a violation of the defendant's promises" in connection with a restrictive covenant. Mattis v. Lally, 82 A.2d 155, 157 (Conn. 1951); see also Lampson Lumber Co. v. Caporale, 102 A.2d 875, 878 (Conn. 1954) ("If the named defendant is threatening a breach of the restrictive covenant, there can be no question that the plaintiff is entitled to an injunction restraining the breach, irrespective of whether the damage it will suffer is great or small.").

10.      In addition, irreparable harm is established as a matter of law based on Lesnar's admission in his 2003 Contract of the "special, unique, and extraordinary nature" of his obligations to WWE.  2003 Contract at ¶ 12.3, Ex. 5.  The seminal case of Philadelphia Ball Club v. Lajoie, 51 A. 973 (Pa. 1902), held that where an athlete's services "are of such a unique character, and display such a special knowledge, skill, and ability, as renders them of peculiar value to the plaintiff, and so difficult of substitution"—as Lesnar acknowledged his services to be under the 2003 Contract and the Settlement Agreement—"**their loss will produce 'irreparable injury,' in the legal significance of that term.**" Lajoie, 51 A. at 974 (emphasis added).

11.    Relying on that authority, the Second Circuit has stated that "[i]t is a settled rule of law that where a person agrees to render services that are unique and extraordinary, and which may not be rendered by another, and has made a negative covenant in his agreement whereby he promises not to render such service to others, the court may issue an injunction to prevent him from violating the negative covenant in order to induce him to perform his contract." Shubert Theatrical Co. v. Rath, 271 F. 827, 831 (2d Cir. 1921) (citations omitted); Ticor, 173 F.3d at 70 (in cases involving "musicians, professional athletes, actors and the like . . . injunctive relief has been available to prevent the breach of an employment contract where the individual has such ability and reputation that his or her place may not be easily filled"); Stiefel v. Blitz, No. 93 Civ. 6080, 1993 WL 526386, at *3 (S.D.N.Y. Dec. 14, 1993) ("Famous entertainers have been enjoined when found to be in violation of an exclusive personal service contract."); Nassau Sports v. Peters, 352 F. Supp. 870, 875 (E.D.N.Y. 1972) ("it has long been settled that injunctive relief may be granted to restrain an employee's violation of negative covenants in a personal services contract and such enforcement has in fact been granted in numerous cases involving professional athletes.").

12.    Second Circuit law further holds that performers' and athletes' services—like Lesnar's here—are *prima facie* considered to be "unique and extraordinary" under this standard. Shubert, 271 F. at 831; Nassau Sports, 352 F. Supp. at 876. Lesnar's breach of his "special, unique, and extraordinary" obligations to WWE, therefore, has caused and continues to cause WWE irreparable harm.

13.    Irreparable injury to WWE is also presumed from its threatened loss of control over its exclusive rights to exploit Lesnar's unique name and likeness. See Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79-80 (2d Cir. 1981) (finding irreparable harm because Warner

Bros. "incurred great expense to publicize the symbols which identify the 'General Lee' . . . and its licensing program will lose much of the confidence reposed in it by the licensees, who also made substantial investments based upon the exclusivity of their licenses"); see also Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982) (holding that loss of control over reputation and goodwill is by nature irreparable and cannot be adequately measured by monetary damages); Ryan v. Volpone Stamp Co., 107 F. Supp. 2d 369, 403 (S.D.N.Y. 2000) (finding irreparable harm to support entry of preliminary injunction based on threat of loss of control over licensing of plaintiff's name and likeness); 5 J. Thomas McCarthy, *McCarthy's on Trademarks and Unfair Competition* § 30.47 (4th ed. 2005).

14.     Indeed, the Second Circuit has noted that a television programmer's product licensing arrangements may be "ultimately more profitable than the T.V. series itself." Warner Bros., 658 F.2d at 79; see also Universal City Studios, Inc. v. J.A.R. Sales, Inc., No. 82-4892-AAH, 1982 WL 1279, at *3 (C.D. Cal. Oct. 20, 1982) ("Universal has entered into numerous merchandising licenses over the years based upon its property rights in various copyrights, trademarks, service marks and characters, and has developed a large and valuable business in such licensing which has produced substantial income for Universal.").

15.     Lesnar has purported to grant New Japan exclusive rights to his wrestling services and to televise wrestling matches in which he performs (and to reproduce them in videotapes or disks) for, *inter alia,* the upcoming February 19, 2006 New Japan event in violation of WWE's exclusive, worldwide licensing rights to Lesnar's name and likeness pursuant to Paragraph 3(b) of the Settlement Agreement.

16.     WWE invested significant resources to develop and promote Lesnar, thereby causing his name, likeness and wrestling persona to have unique value in the professional

wrestling industry associated with and to WWE. Among other things, WWE invested millions of dollars creating storylines and themes for Lesnar and promoting Lesnar through television, pay-per-view events, magazines, the Internet and other means.

17.     WWE cannot feasibly quantify the damages flowing from WWE's loss of exclusivity to Lesnar's licensing rights, which further establishes the irreparable nature of WWE's harm.

18.     Further, Lesnar's Exclusivity Obligations under the Settlement Agreement constitute valuable consideration underlying that contract. Particularly given WWE's direct competition with New Japan in the Japanese market, WWE will suffer irreparable harm if it is deprived of the benefit of its bargain in entering into the Settlement Agreement and New Japan is permitted to exploit Lesnar's unique name and likeness in violation of Lesnar's Exclusivity Obligations to WWE.

19.     For months, Lesnar and his lawyer/agent Olsen have obfuscated, and indeed affirmatively misrepresented, both to WWE and this Court Lesnar's dealings with New Japan as a result of which the true nature and extent of those dealings as well as the extent of his deception and concealment were not known until Lesnar's deposition on November 21, 2005. Although WWE suspected certain dealings between Lesnar and New Japan prior to Lesnar's deposition, WWE never had advance knowledge of specific performances at which Lesnar intended to and/or contracted to appear for New Japan to enable WWE to move for injunctive relief prior to filing its motion for temporary restraining order and preliminary injunction (the "TRO/PI Motion") on December 6, 2005.

20.     With regard to the January 2005 New Japan event, Olsen fundamentally misrepresented the nature of Lesnar's involvement up to and even after the show. Moreover,

Lesnar has continued to dispute that this appearance constituted a breach of the Settlement Agreement in stark contrast to the admitted breach arising from his subsequent performances for New Japan.

21.     With regard to the October 8, 2005 event, Lesnar's claim that WWE did nothing to stop him from performing is equally disingenuous because, despite being subject to this Court's September 15 Order compelling the production of documents concerning his dealings with New Japan, Lesnar did not produce any documents relating to his performance at the October 8 event until one week after the show.

22.     In continued violation of this Court's compulsion order, Lesnar similarly failed to produce his contracts with New Japan for his performances on December 10, December 11, and January 4, 2006 prior to his deposition.  WWE only obtained those contracts by happenstance when Lesnar testified at the end of his deposition that he had copies of those contracts in his possession—unbeknownst to his trial counsel.

23.     Upon learning of Lesnar's scheduled and contracted performances for New Japan on December 10 and 11, 2005 and January 4, 2006, WWE timely the TRO/PI Motion on December 6, 2005.  By Order dated December 15, 2005, the Court denied WWE's request for a temporary restraining order and scheduled a preliminary injunction hearing for January 3, 2006.  Because the preliminary injunction hearing would have occurred virtually simultaneous with Lesnar's scheduled performance in Japan (12 hours ahead of Eastern Standard Time) on January 4, 2006, and based on Lesnar's counsel's representation that Lesnar had no further performances for New Japan scheduled in the future, WWE entered into an agreement with Lesnar's counsel to withdraw its TRO/PI Motion without prejudice on the understanding that WWE could renew its motion at any time in the future if Lesnar intended to perform at another New Japan event.

28

24.     Within weeks, WWE learned that Lesnar was scheduled to perform for New Japan at its February 19, 2006 event.  WWE promptly filed a renewed TRO/PI Motion on January 10, 2006.

## C.     WWE Has Established That It Is Likely To Succeed On The Merits

25.     The essence of Lesnar's relationship with WWE was his license to WWE of various exclusive rights to his intellectual property, including, but not limited to, exclusive rights to his performances and separately the exclusive right to utilize his name and likeness for the licensing of WWE-branded merchandise.  By exploiting those exclusive rights, WWE created and developed a highly successful wrestling character and persona as well as a lucrative licensing commodity.

26.     The benefit of the bargain for WWE was that after it invested significant resources in the development and promotion of Lesnar's wrestling character and persona, it would have the exclusive right to market Lesnar's wrestling character and persona for the duration of the contract to enable WWE to realize a return on its investment.  In fact, WWE continues to exploit its exclusive licensing rights to Lesnar's intellectual property through, among other things, WWE-branded home video products, video games, and books.  Such exclusive licensing rights thus constitute a valuable asset and revenue source to WWE distinct from Lesnar's performance at WWE events, the last of which occurred nearly two years ago.

27.     Lesnar has admitted that if the Settlement Agreement is valid and enforceable, then his contracts with and performances for New Japan are in violation and breach of the Settlement Agreement.  Because the Settlement Agreement is enforceable and Lesnar's breach thereof is uncontested, WWE is likely to succeed on the merits.

28.     Section 3(b) of the Settlement Agreement reaffirms Lesnar's Exclusive Licensing Obligations to WWE through June 30, 2010.  Specifically, Section 3(b) preserves WWE's "exclusive licensing rights under the [2003 Contract] until June 30, 2010" and precludes Lesnar from "licens[ing] or otherwise grant[ing] to any third party, other than the National Football League, the rights to exploit his name and likeness." See Settlement Agreement at ¶ 3(b), Ex. 5. Significantly, Lesnar does not challenge, but in fact expressly concedes, the enforceability of Section 3(b) and its dispositive effect on his claims in this action.  In his Summary Judgment Brief, Lesnar admits:

> the [Settlement] Agreement itself plainly provides that, "in further consideration for [Lesnar's] early release from the Agreements, he will not license or otherwise grant to any third party, other than the National Football League, the rights to exploit his name and likeness." In other words, according to the [Settlement] Agreement's plain wording, WWE agreed to pay Lesnar royalties in exchange for his agreement not to license his name and likeness to anyone other than the WWE and NFL . . . .

Summary Judgment Brief at 30 (emphasis added).

29.     This fatal admission forecloses Lesnar's claims.  Irrespective of Lesnar's arguments regarding the Exclusive Performance Obligations (which Lesnar mischaracterizes as the so-called non-competition provision) of Section 4(a) of the Settlement Agreement, by his own admission, WWE independently agreed to pay Lesnar royalties in exchange for his (now broken) agreement not to license his name and likeness to anyone other than WWE and NFL.

30.     In violation of his admissions and agreements, Lesnar has acknowledged that he granted New Japan exclusive rights to his wrestling services and to televise wrestling matches in which he performs (and to reproduce them in videotapes or disks) for the New Japan events that occurred on October 8, 2005, December 10, 2005, December 11, 2005 and January 4, 2006, as

well the upcoming February 19, 2006 New Japan event.  Lesnar has further admitted that he

licensed and/or granted to New Japan the right to exploit his name and likeness for merchandise.

Such licensing of rights to New Japan or any other third party—i.e., someone other than WWE

and NFL—is in plain violation of Lesnar's Exclusive Licensing Obligations to WWE under

Section 3(b) of the Settlement Agreement, the enforceability of which are undisputed.

31.     In addition, Lesnar's contracts with and performances for New Japan plainly are

in violation of Section 4(a) of the Settlement Agreement, which precludes Lesnar from

"appear[ing], participat[ing], and/or associate[ing] either directly or indirectly in any way

throughout the world with any professional wrestling, ultimate fighting and/or sports

entertainment companies" other than WWE.  Settlement Agreement at ¶ 4(a), Ex. 5.  Although

Lesnar has challenged the enforceability of Section 4(a) under inapposite non-compete

principles, he concedes that his performances for New Japan are in violation of the terms of the

Settlement Agreement.

32.     In his Memorandum in Opposition to WWE's Motion for Temporary Restraining

Order and Preliminary Injunction (the "TRO/PI Opposition"), Lesnar attempts to mischaracterize

that aspect of this lawsuit as a garden-variety non-compete dispute.  However, that is not this

case.  The agreement that Lesnar is attempting to invalidate is not an employment agreement

with post-employment restrictions, but rather a settlement agreement arising as a result of

Lesnar's breach of his 2003 Contract.  As such, Lesnar's reliance on law applicable to non-

compete agreements ancillary to employment is misplaced.

33.     Settlement agreements are contracts that are "encouraged as a matter of public

policy because they promote the amicable resolution of disputes and lighten the increasing load

of litigation faced by the courts."  Mr. J. v. Board of Educ., 98 F. Supp. 2d 226, 238 (D. Conn.

2000); <u>see also</u> <u>Anita Foundations, Inc. v. ILGWU National Retirement Fund</u>, 902 F.2d 185, 190

(2d Cir. 1990) ("Courts are wary of disturbing settlements, because they represent compromise

and conservation of judicial resources, two concepts highly regarded in American

jurisprudence."). "It is well recognized that an agreement to settle a lawsuit, voluntarily entered

into, is binding on the parties." <u>Lorraine Brown and Virginia Otis v. Nationscredit Commercial</u>,

No. 3:99-CV-592 (EBB), 2000 WL 888507, at *2 (D. Conn. June 23, 2000).

     34.    Controlling law mandates that courts uphold and enforce settlement agreements

even in the face of improvident bargains and unpalatable results:

> Courts do not unmake bargains unwisely made. Absent other
> infirmities, bargains moved on calculated considerations, and
> whether provident or improvident, are entitled nevertheless to
> sanctions of the law. . . . Although parties might prefer to have the
> court decide the plain effect of their contract contrary to the
> agreement, <u>it is not within its power to make a new and different
> agreement; contracts voluntarily and fairly made should be held
> valid and enforced in the courts</u>. . . . Even if the result of the fair
> and logical enforcement of those unambiguous agreements seems
> unduly to burden one of the parties, we decline to embark [on] a
> voyage into uncharted waters in which untrammeled and
> unrestrained judicial revisionism would depart significantly from
> an aspect of contract law upon which contracting parties
> reasonably can be assumed to have relied for many years. . . .
> To put it succinctly, settlement agreements will not serve their
> purpose of putting opposing claims to rest if, despite a fairly
> negotiated comprehensive and unambiguous merger clause, they
> remain subject to judicial revision.

<u>Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, L.P.</u>, 746 A.2d 1277, 1292

(Conn. 2000) (citations omitted) (emphasis in original); <u>see also</u> <u>Mr. J.</u>, 98 F. Supp. 2d at 238

(enforcing a settlement agreement to avoid allowing a party "to void settlement agreements when

they become unpalatable" because doing so "would work a significant deterrence contrary to the

federal policy of encouraging settlement agreements"); <u>Sartor v. Town of Manchester</u>, 312 F.

Supp. 2d 238, 244 (D. Conn. 2004) (Droney, J.) (enforcing terms of severance agreement

because "[t]o allow subsequent events, such as the Board's change of heart, to upset the Agreement is inconsistent with basic contract law."); Parks v. Baldwin Piano & Organ Co., 262 F. Supp. 515, 519-20 (D. Conn. 1967), aff'd 386 F.2d 828 (2d Cir. 1967) (observing that mere disappointment in expectations does not permit the court to make a new contract or to insert protective conditions which the parties did not provide for themselves).

35.     Absent fraud, duress, illegality, or mutual mistake—none of which are alleged and none of which exist in this case—the Settlement Agreement must be enforced according to its terms. Janneh v. GAP Corp., 887 F.2d 432, 436 (2d Cir. 1989), abrogated on other grounds, Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863 (1994); Mill Creek Group, Inc. v. FDIC, 136 F. Supp. 2d 36, 51 (D. Conn. 2001).

36.     Lesnar's claim that he did not have an opportunity to consult with his attorney regarding the Settlement Agreement is inaccurate and disingenuous.  Lesnar admits that he forwarded the draft Settlement Agreement to his lawyer/agent Olsen, who advised him that he did not think it looked good from Lesnar's perspective.  Lesnar Depo. at 27:14-16.

37.     Lesnar's claim that he did not read the Settlement Agreement before signing is legally irrelevant.  "Under Connecticut law, the general rule is that where a person of mature years and who can read and write signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it and notice of its contents will be imputed to him if he negligently fails to do so."  Delk v. Go Vertical, Inc., 303 F. Supp. 2d 94, 99 (D. Conn. 2004) (citations omitted).

38.     Lesnar's claim that despite its title it is not really a "settlement agreement" because there was no dispute to settle when the Settlement Agreement was executed, is wholly unfounded.  See TRO/PI Opposition at 14.  As Lesnar himself admits, the Settlement Agreement

33

arose out of his refusal to perform his 2003 Contract. <u>See</u> TRO/PI Opposition at 14-15.   In

March 2004, after WWE had invested substantial amounts of time and money developing and

promoting Lesnar's wrestling character and persona to be a centerpiece of WWE programming

(and paid Lesnar approximately $3 million), and after he had been scheduled and advertised to

be a headliner at WWE's signature event WRESTLEMANIA XX and in the creative storylines

over the ensuing months, Lesnar out-of-the-blue advised WWE that he intended to quit in breach

of the 2003 Contract. At the same time, Lesnar requested an early release from certain of his

contractual obligations in order to pursue a career in professional football.

39.     In order to avoid litigation resulting from Lesnar's breach of the 2003 Contract,

which could have included seeking injunctive relief to prevent Lesnar from breaching his

Exclusivity Obligations to WWE, and to accommodate Lesnar's request to pursue a professional

football career while otherwise reaffirming his Exclusivity Obligations under his 2003 Contract,

WWE and Lesnar mutually entered into the Settlement Agreement. In addition to resolving

WWE's breach of contract claims, the Settlement Agreement also provided for Lesnar to receive

royalties (amounting to more than $125,000 between April 2004 and January 2005), to which he

otherwise was not entitled as a result of his breach. It is thus indisputable that WWE settled

potential claims against Lesnar pursuant to the Settlement Agreement, thereby making it subject

to the controlling law that mandates strict enforcement of its terms.

40.     Lesnar's claim that the Exclusive Licensing Obligations of the Settlement

Agreement are "inextricably intertwined with, and are part and parcel of," the so-called non-

competition provision of Section 4(a) is unfounded as a matter of fact and law. On their face, the

Exclusive Licensing Obligations are separate and independent terms contained in distinct

provisions of the Settlement Agreement, as the Exclusive Licensing Obligations are set forth in

34

Section 3(b) while the so-called "non-compete" provision is set forth in Section 4(a). Substantively, the Exclusive Licensing Obligations only concern WWE exclusivity with respect to licensing rights (including, but not limited to, Lesnar's name and likeness) and in no way purport to restrict Lesnar's ability to work, as the TRO/PI Opposition erroneously claims. Lesnar remains free to work for WWE, NFL, NFL Europe, or in a variety of other occupations (including a wrestling coach or personal trainer), all of which Lesnar has chosen to reject. Moreover, such Exclusive Licensing Obligations were the material consideration underlying WWE's agreement to enter into the 2003 Contract and the Settlement Agreement.

41.     As a matter of law, Lesnar's purported interpretation of the Settlement Agreement effectively would render the Exclusive Licensing Obligations "mere surplusage and inoperative"—an outcome proscribed by settled canons of contract interpretation under Connecticut law.  A.M. Larson Co. v. Lawlor Ins. Agency, 220 A.2d 32, 34 (Conn. 1966); Patron v. Konover, 646 A.2d 901, 908 (Conn. App. 1994).  To the contrary, "[a] contract should be construed so as to give full meaning and effect to *all of its provisions*."  Levine v. Advest, Inc., 714 A.2d 649, 660 (Conn. 1998) (emphasis in original).  Under controlling law, therefore, the Exclusive Licensing Obligations set forth in Section 3(b)—which Lesnar does not challenge and in fact concedes—must be independently construed and enforced according to their terms.

42.     After willingly accepting the benefits of the Settlement Agreement, Lesnar is now estopped from challenging the enforceability of his dependent obligations to WWE under the Settlement Agreement.  Connecticut law holds that "one enjoying rights is estopped from repudiating dependent obligations which he has assumed; parties cannot accept benefits under a contract fairly made and at the same time question its validity." Doherty v. Sullivan, 29 Conn. App. 736, 741 (Conn. App. 1992), citing Schwarzchild v. Martin, 191 Conn. 316, 321 (1983);

see also <u>Mozzochi v. Luchs</u>, 35 Conn. Supp. 19, 23 (Conn. Super. 1977) ("It is well established law that one enjoying rights is estopped from repudiating the dependent conditions and obligations which he has assumed.  Parties cannot accept benefits under a contract fairly made and at the same time question its validity.").

43.     In <u>Doherty</u>, the Connecticut Court of Appeals affirmed the trial court's holding that a settlement agreement was valid and enforceable because the plaintiff accepted the benefits of a settlement agreement, which was voluntarily entered into to mutually resolve an employment dispute.  <u>See Doherty</u>, 29 Conn. App. at 740.  Noting that "[o]ur law has long been clear that 'a compromise agreement if free from fraud, mistake or undue influence is conclusive between the parties,'" <u>Id.</u> at 741 (citations omitted), the court rejected the plaintiff's attempt to nullify the settlement agreement after accepting its benefits.

44.     Similarly, here, Lesnar is asking this Court to essentially nullify the Settlement Agreement despite having accepted its benefits:  <u>first</u>, Lesnar received the benefit of more than $125,000 in royalties to which he was not otherwise entitled; <u>second</u>, Lesnar received the benefit of a release to try out for the NFL; <u>third</u>, Lesnar received the benefit of no longer having to travel and perform as a professional wrestler, which Lesnar admits he was unable to handle; <u>fourth</u>, Lesnar received the benefit of WWE forbearing its right to litigate Lesnar's breach of the 2003 Contract, including obtaining injunctive relief to prevent Lesnar from breaching his Exclusivity Obligations to WWE; and <u>fifth</u>, Lesnar received the benefit of WWE forbearing its right to suspend Lesnar and correspondingly extend the term of the 2003 Contract for the length of the suspension.

45.     While Lesnar has willingly accepted the benefits he received under the Settlement Agreement, he seeks to deprive WWE of its benefit of the bargain—the Exclusivity Obligations

36

through the term of the 2003 Contract. Connecticut law prohibits such an inequitable result. See Lampson Lumber Co. v. Caporeale, 102 A.2d 875, 877 (Conn. 1954) (holding with respect to a negative covenant in a deed, "[i]t is fair to assume that the premises . . . would not have been sold without the restriction. It is also fair to assume that the price of the property sold was affected thereby. . . . To permit the named defendant to have the property free of the restriction would be inequitable."); Welles v. O'Connell, 183 A.2d 287, 290 (Conn. C.P. 1962) ("To permit a party who has voluntarily entered into such an agreement, for a valuable consideration perhaps in large part based on it, to escape the consequences of his acts, as is illustrated in this case, smacks of unfairness and savors of an encouragement to dishonest."). Indeed, the court in Welles pertinently ruled:

> to excuse this defendant from her agreement would likewise return to her a large part of what she offered as consideration for the contract, namely, refraining from engaging in the business which the plaintiff agreed to teach her, in the specified area. It is fair to assume the contract would not have been made without the restriction. To permit the defendant now to have the benefit of that contract free of the restriction would be inequitable.

Welles, 183 A.2d at 340-341. As a matter of law and equity, Lesnar should not be permitted to accept the benefits of the Settlement Agreement while at the same time seeking to have the Court declare unenforceable his dependant obligations.

46.     Accordingly, Lesnar should not be permitted to perform for New Japan in admitted violation of the Settlement Agreement pending the Court's determination on the merits of this action, particularly in the face of Second Circuit law enforcing restrictive covenants in exclusive services contracts for services that, like Lesnar's services here, are unique or extraordinary. See Ticor, 173 F.3d at 70; Bradford v. New York Times Co., 501 F.2d 51, 58 (2d Cir. 1974) (upholding ten year non-compete with no geographic restriction largely based on

finding the plaintiff's services to be "special, unique, or extraordinary"); <u>Shubert</u>, 271 F. at 831;

<u>Stiefel</u>, 1993 WL 526386, at *3 ("Famous entertainers have been enjoined when found to be in

violation of an exclusive personal service contract.").

      47.     Entry of a preliminary injunction thus simply would preserve the status quo to

prevent Lesnar from engaging in further conduct, which he admits violates the terms of the

Settlement Agreement.

Respectfully submitted,

By: _____

Jerry S. McDevitt (*pro hac vice*, ct11783)
Mark D. Feczko (*pro hac vice*, ct20426)
Curtis B. Krasik (*pro hac vice pending*)
Christopher Michalski (*pro hac vice*, phv0290)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500

Daniel L. Schwartz, Esq. (ct09862)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 977-7300

Attorneys for Defendant,
World Wrestling Entertainment, Inc.

38

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by hand delivery on the date hereof to the following counsel of record:

Scott S. Centrella, Esq.
Anne C. LeVasseur, Esq.
Diserio Martin O'Connor & Castiglioni LLP
One Atlantic Street
Stamford, CT  06901

FEBRUARY 15, 2006